IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESTER HOGAN, | No. No. C 07-0779 SBA (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| LARRY SMALL, Warden, | |
| Respondent. | |

## INTRODUCTION

This matter is now before the Court for consideration of Petitioner's pro se petition for a writ of habeas corpus. Respondent has filed an answer to the petition. Petitioner has not filed an optional traverse. For the reasons discussed below, the petition is DENIED as to all claims.

## BACKGROUND

**I.  Case History**

A San Francisco County jury convicted Petitioner on two counts of attempted murder, two counts of assault with a firearm, one count of being a violent felon in possession of a firearm, and one count of being a felon in possession of a firearm. (Resp't Ex. F (opinion of the court of appeal) at 1.) He was sentenced to prison for sixty years to life. (Id.) The California Court of Appeal reversed the conviction for being a felon in possession of a firearm, but otherwise affirmed. (Id.) The California Supreme Court denied Petitioner's two petitions for review. (Resp't Ex. H, J.)

The first petition in this case was filed on February 6, 2007. Before the Court had an opportunity to review the petition, Petitioner filed a motion for leave to amend to correct errors in the petition. On May 17, 2007, the Court granted the motion for leave to amend. When Petitioner actually filed the amendment, however, it was erroneously construed new case and assigned docket number C 07-2880 SBA (PR). Petitioner also filed a motion for stay and abeyance around the same time he filed the amendment. He subsequently withdrew that motion.

In an order entered on January 17, 2008, the Court ordered the clerk to revoke the filing in C 07-2880 SBA (PR) and to file the amendment in this case. The Court also ordered respondent to show cause why the petition should not be granted.

On February 28, 2008, Respondent filed a motion to dismiss for failure to exhaust. On March 27, 2008, Petitioner moved for leave to amend and to stay the case pending exhaustion. The Court granted the motion to stay and denied the motion to dismiss.

When Petitioner filed an amended petition, the Court treated it as a motion to lift the stay upon completion of exhaustion, granted it, and ordered Respondent to answer. He has answered; Petitioner has not filed an optional traverse.

## II. **Statement of Facts**

The following summary of the evidence at trial is taken from the opinion of the California Court of Appeal:

*Prosecution Case*

On October 6, 2001, Nafanua Eneliko was not quite 18 years old. That morning, he and his friend, 16-year-old Durrell Tanner, were sitting in front of the house that Eneliko shared with his parents and siblings on Cameron Way, in the Alice Griffith Housing Project in San Francisco. They were eating breakfast and talking. While sitting there, they saw three or four male teenagers break into a car across the street and take "stuff" out of it. Eneliko knew the car belonged to appellant, whom he knew as "Les." Eneliko did not say anything to the boys because he had heard that when people in his neighborhood "snitch, ... bad stuff happened to them."

Appellant lived across the street from Eneliko on Cameron Way, with his wife and children. Eneliko, who had lived on the street for about a year, saw appellant several times a week, and they would greet each other. Appellant would be coming and going, sitting in front of his house listening to the radio, or washing his car when Eneliko saw him. Eneliko had heard Tanner, who lived a couple of doors down from appellant on Cameron Way, greet appellant too.

A few minutes after the boys who broke into the car left, appellant pulled up in another car. He was mad and "started going crazy, like screaming, yelling, run

2

around the street, like he wanted to know who did that to his car." Appellant then drove off in the car that had been vandalized.

A short time later, Eneliko saw appellant walking up the sidewalk toward him and Tanner on their side of the street. Eneliko saw appellant's face and knew it was him; appellant looked mad. Appellant was wearing a black coat and a black beanie. Eneliko went back to talking with Tanner but, out of the corner of his eye, saw appellant stop at the edge of Eneliko's fence, and saw that appellant was pointing a gun in his direction.

Appellant started shooting, and Eneliko tried to crawl into his house. Tanner grabbed him around the waist and dragged him inside. Eneliko had a bullet wound in the abdomen. He was scared that he was going to die. Once inside, his mother held him in her lap on the floor while waiting for the police and ambulance to arrive. At first, he did not want to tell who shot him because he had been advised to keep his mouth shut if anything happened in the neighborhood. But when he started to feel like he was going to die, he told his sister and mother that Les from across the street had shot him. Shortly after Eneliko told his 16-year-old sister and his mother who had shot him, Tanner, who was standing next to him, said, "It was Les."

After the police arrived, Eneliko passed out. He woke up at the hospital after undergoing surgery. He was in the hospital for about a week. He was out of school for three or four months, and it took about nine months for him to fully recover from the shooting. [Footnote 2: Dr. Robert Mackersie, a surgeon and the director of trauma services at San Francisco General Hospital, treated Eneliko, who was in critical condition, for a gunshot wound to the abdomen.]

While Eneliko was in the hospital, the police came, and Inspector Militello showed him six photographs. He picked out "Les" (appellant) and said he was 100 percent sure that he was the shooter. At trial, appellant was still 100 percent sure that it was appellant who shot him.

In 2002, Eneliko moved out of state for his safety and the safety of his family in the Bay Area. He was flown back to San Francisco to testify at the trial. Some months after the shooting, a man called Eneliko and identified himself as Les. The man said if Eneliko dropped the case, he would give Eneliko $5,000. Eneliko refused. [Footnote 3: Eneliko acknowledged that he had been involved in criminal activity and had been arrested as a juvenile.]

Durrell Tanner testified that he did not want to participate in the trial and was present only because police officers went to his home and brought him to court. He lived across the street from Eneliko on Cameron Way, and had known Eneliko for about a year at the time of the shooting. Tanner still lived on Cameron Way at the time of trial. He said he did not recall seeing anyone break into a car and did not see who shot at him and Eneliko on October 6, 2001. He did not remember identifying appellant at the preliminary hearing as the person who shot Eneliko; nor did he remember saying to anyone that Les was the shooter or telling police to check 47 Cameron Way. He did not recall being shown six photographs by Inspector Militello; nor did he recall being shown the letters "D-T," his initials, or the notation "100 percent" on the photo spread.

Tanner did not remember a man named Les living across the street from Eneliko and did not recall testifying at the preliminary hearing regarding Les, including that he saw Les almost every day. He stated that he did not remember in response to almost every question related to the shooting, and said he did not believe

3

reviewing the preliminary hearing transcript would refresh his recollection.

After a break, during which Tanner had talked to his mother on the telephone and had started crying, he acknowledged that he knew Les, who lived across the street from Eneliko, and identified Les as appellant. Tanner had seen Les a few times before the shooting and never had any problems with him. When asked if appellant was the person that shot at him and Eneliko, he said, "No, not that I remember."

The prosecutor read from a transcript of the preliminary hearing, at which time Tanner had testified that Lester lived across the street from Eneliko, he saw Lester almost every day, and he always got along well with him. On the morning of the shooting, he was at Eneliko's house when he saw that a window had been broken on Lester's car. He then saw Lester pull up in another car and start screaming and cursing when he saw the damage. Later, when Tanner and Eneliko were sitting on the porch eating, he saw Les walk up. He heard Eneliko say, "watch out," and saw Lester point a gun and start shooting at them. After the shooting, Inspector Militello showed him a photo lineup containing six photographs. He identified the person who had done the shooting and told the inspector he was 100 percent sure that person had shot at them.

At the preliminary hearing, Tanner identified appellant as the man who had shot at him. He also acknowledged that his parents were afraid of his being involved in the proceedings and urged him not to testify. He also acknowledged that he was a little afraid to be involved.

At trial, Tanner admitted that he had been told by a lot of people over the years that it is a bad idea to get involved in other people's business, to snitch, or to testify, and that you could get hurt for sticking your nose in other people's business. He felt that way about this case.

San Francisco Police Sergeant Kimberly Reynolds was the first officer to arrive at 54 Cameron Way on October 6, 2001. Eneliko was lying in his mother's arms. It took a while to get any information due to the chaos at the scene, but she got an initial description of the shooter as a Black male wearing black clothing. A juvenile, later identified as Durrell Tanner, told Sergeant Reynolds to check 47 Cameron Way. A team went to that address, but there was no answer when they knocked at the door. They later returned to the house. A woman opened the door, and then tried to slam it shut. They did not find appellant at the house that day; he was arrested later at a different location.

San Francisco Police Inspector Lea Militello testified that, when she arrived at the scene, she saw a computer aided dispatch (CAD) printout that stated that the shooter may be a Black male juvenile. However, "[n]ot everything in the CAD is always a hundred percent accurate." Inspector Militello did not focus her investigation on a juvenile because at no time during the course of the investigation did anyone tell her the suspect was a Black male juvenile. She spoke with Eneliko's aunt, Liliani Opetaia, after the 911 call, and Opetaia described the shooter as a Black male adult in his late 30's. She interviewed Eneliko on October 7, 2001, and he told her the shooter's name was "Les."

The investigating officers received information from Department of Motor Vehicles records that appellant listed 47 Cameron Way as his address.

Inspector Militello testified that, on the day of the shooting, Tanner's mother was present when Militello interviewed Tanner. Tanner's mother seemed extremely

4

frightened, but Tanner did not appear apprehensive. During that interview, Militello showed Tanner a photo lineup and Tanner picked appellant as the shooter, identifying him as "Les or Lester," without any hesitation. Tanner wrote his initials on the photo lineup and also wrote, "100 percent."

*Defense Case*

Eneliko's aunt, Liliani Opetaia, testified that, on the morning of October 6, 2001, she was in the kitchen of Eneliko's home when she heard a gunshot. She looked out the window and saw someone in a black jacket at the corner of the fence holding a gun. She did not see the person's face because she only saw him from the side and that part of his face was covered with a black beanie or a hat. After Eneliko's friend helped Eneliko into the house and she realized he had been shot, Opetaia called 911. She did not recall giving any description of the shooter to the 911 operator. Opetaia did not hear Eneliko or his friend say anything about who had shot Eneliko. She acknowledged on cross-examination that she could not hear everything that was said in the house while she was talking to the 911 operator.

Sergeant Reynolds testified that she returned to 47 Cameron Way (appellant's home) later on October 6, 2001, due to a call regarding vandalism in progress. The inside of the house was "a mess and vandalized."

(Resp't Ex. F at 2-7.)

## DISCUSSION

### I. Standard of Review for State Court Decisions

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004). It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

#### A. Section 2254(d)(1)

Challenges to purely legal questions resolved by a state court are reviewed under

1  § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim
2  adjudicated on the merits in state court only if the state court adjudication resulted in a decision that
3  was "contrary to" or "involved an unreasonable application of, clearly established Federal law, as
4  determined by the Supreme Court of the United States." Williams v. Taylor, 529 U.S. 362, 402-04,
5  409 (2000). While the "contrary to" and "unreasonable application" clauses have independent
6  meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's
7  allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000),
8  overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

### 1. **Clearly Established Federal Law**

"Clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "[Section] 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. Williams, 529 U.S. at 391. There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to

6

assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000).

### 2. "Contrary To"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

### 3. "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; accord Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it. Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable standard is not a clear error standard. Andrade, 538 U.S. at 75-

76 (rejecting <u>Van Tran</u>'s use of "clear error" standard); <u>Clark</u>, 331 F.3d at 1067-69 (acknowledging the overruling of <u>Van Tran</u> on this point). After <u>Andrade</u>,

> [t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously a afforded them.

<u>Id.</u> In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result. <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054 (9th Cir. 2003).

**B.     Sections 2254(d)(2), 2254(e)(1)**

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where a state court fails to consider and weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly presented and made part of the state court record. <u>Taylor v. Maddox</u>, 366 F.3d 992, 1005 (9th Cir. 2004). A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court. See <u>Taylor</u>, 366 F.3d at 999-1000. In <u>Taylor</u>, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1). <u>Id.</u> First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2). <u>Id.</u> at 1000. The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings. <u>Id.</u> Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by dressing the state court finding in a presumption of correctness under § 2254(e)(1). <u>Id.</u> According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence

8

presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error. See 28 U.S.C. § 2254(e)(1). "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." Taylor, 366 F.3d at 1000.

When there is no reasoned opinion from the highest state court to consider the Petitioner's claim, the Court looks to the last reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). Here, the California Court of Appeal was the highest state court to issue an explained opinion on Petitioner's claim.

## II.     **Exhaustion**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through state collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987). The parties do not dispute that after the stay and Petitioner's state court proceedings, the present claims are exhausted. The Court, therefore, considers Petitioner's claim on the merits.

## III.    **Legal Claims**

Petitioner claims that (1) the trial court "acted in excess of its statutory jurisdiction" by refusing to admit a police dispatch record; (2) the trial court "acted in excess of its statutory jurisdiction" by admitting the preliminary hearing testimony of a testifying witness as impeachment; and (3) the trial court "acted in excess of its statutory jurisdiction" and committed "fundamental constitutional error" by refusing to admit evidence that a third party committed the crime.

### A.     **CAD Record**

Petitioner's first contention is that the trial court "acted in excess of its statutory jurisdiction" by refusing to admit a police dispatch record. (Am. Pet. at Ex. A.) This assertion will be construed as being a claim that Petitioner's due process rights were violated by the court's refusal to admit the

9

evidence.

After the jury had been selected, but before opening statements, Petitioner moved to admit a Computer Aided Dispatch report that he had received from the custodian of records at emergency services. (Resp't Ex. B at 555-56.) The document consists of a series of notes by the dispatcher; at 10:14:01 the note reads: "RP [reporting party?] SAYS A BMJ [black male juvenile] SHOT HER NEPHEW." (Am. Pet., Ex. A at 1.) The defense wanted the report admitted because of the reference to the shooter as being a juvenile; Petitioner is an adult, so the reference to a juvenile would support the defense theory that the crime was committed by a third party. The trial court concluded that the report was hearsay and declined to admit it "subject to a further foundation being laid." (Resp't Ex. B at 557.) At trial, several police witnesses referred to the report and were questioned about it. (Id. at 1311-12, 1354-55, 1374-76, 1804, 1815, 1818, 1823-24, 1816.)

Petitioner's counsel again moved to admit the CAD report near the close of evidence, saying that she had subpoenaed the custodian of records and could put her on if that would help. (Id. at 1862-63.) The court said "[i]t's up to you as to whether or not you want to call the custodian of records. My gut reaction is that, based the testimony I've heard so far, it's going to be inadmissable hearsay." (Id. at 1869.) The exhibit, when subsequently offered, was excluded. (Id. at 1874.)

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotations and citations omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. See Holmes, 547 U.S. at 324. "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Id. at 325-26; see Egelhoff, 518 U.S. at 43 (holding that the exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the

traditions and conscience of our people as to be ranked as fundamental."). But "at times a state's rules of evidence cannot be mechanistically applied and must yield in favor of due process and the right to a fair trial." Lunbery v. Hornbeak, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's application of its evidentiary rules to exclude hearsay testimony that bore persuasive assurances of trustworthiness and was critical to the defense violated right to present evidence).

In deciding if the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the court balances the following five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004) (citing Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)); Drayden v. White, 232 F.3d 704, 711 (9th Cir. 2000) (same). The court must also give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based. See Chia, 360 F.3d at 1006; Miller, 757 F.2d at 995.

Here, as to the first of the Miller factors, the probative value of the CAD report itself was minimal, because the fact that it recorded that the reporting party had identified the shooter as a juvenile was in evidence from the testimony of the police officers. (Resp't Ex. B at 1354, 1374, 1381-82.) The reliability of the report was doubtful, as shown by the police testimony that often the reports, which are generated as calls come in, are not accurate. (Id. at 1824.) The evidence probably was capable of being evaluated by the trier of fact. On the other hand, it clearly was cumulative, given the police testimony. And finally, the report itself, as opposed to evidence that the caller said the shooter was a juvenile, was not a major part of the defense, because the fact that the caller said the shooter was a juvenile was before the jury by way of police testimony. Four out of five factors favor a conclusion that refusal to admit the report was not a constitutional violation. Thus, the Court finds that the exclusion of the CAD report did not violate Petitioner's right to a defense.

**B.     Preliminary Hearing Testimony**

In his second claim, Petitioner asserts that the trial court "acted in excess of its statutory jurisdiction" by admitting the preliminary hearing testimony of a testifying witness as impeachment.

11

The claim will be construed as being a contention that Petitioner's due process rights were violated by the court's admission of the evidence. Petitioner contends that admission of the preliminary hearing testimony, rather than excluding all the witness's testimony, "produced a more biased appraisal of the defendant's conduct." (Pet. at Ex. D.)

Darrell Tanner, the victim's friend who was with him when he was shot, had a sudden loss of memory at trial and could not identify Petitioner as the shooter. (Resp't Ex. F [opinion of court of appeal] at 4-5.) The trial court allowed the prosecution to impeach him with inconsistent portions of his preliminary hearing testimony, in which he identified Petitioner. (See, e.g., Resp't Ex. B at 1458-59, 1511-43.)

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999). Here, the evidence was admitted pursuant to section 1385 of the California Evidence Code, which provides that hearsay testimony may be admitted if inconsistent with trial testimony. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) (citing Perry v. Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995). But only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. Jammal, 926 F.2d at 920.

Here, the preliminary hearing testimony was carefully examined by court and counsel outside the presence of the jury to ensure that only portions that were inconsistent with Tanner's trial testimony were admitted. (Resp't Ex. B at 1511-43.) The admission of the testimony therefore was not arbitrary. And while it is certainly true that admission of it injured Petitioner's cause, there was nothing unfairly prejudicial about it; Tanner had indeed testified at the preliminary hearing that

1 Petitioner was the shooter, and it was evident that he had changed his testimony at trial out of fear.

2 And finally, there was a permissible inference that the jury could draw from the preliminary hearing

3 testimony, that Tanner was lying when he claimed not to know who shot the victim. Admission of

4 the evidence thus was not a due process violation. See Jammal, 926 F.2d at 920.

### C. Third-Party Culpability Evidence

Petitioner's final claim is that the trial court "acted in excess of its statutory jurisdiction" and committed "fundamental constitutional error" by refusing to admit evidence that a third party committed the crime. This issue was raised on direct appeal. The court of appeal set out the background:

> Before trial, the court and counsel discussed evidence that Eneliko was shot at twice after the shooting at issue here, in July and September 2002. During a pretrial hearing, the court summarized the defense and prosecution positions regarding this evidence: "And it's the defense's desire to get evidence of that before the jury for the purpose of showing that somebody else is trying to kill him. And it's the People's desire to get those shootings in, and that the People may offer evidence that it's an attempt by the defense to prevent him from testifying in this case."
>
> The court held a hearing, outside the presence of the prosecutor, on the proposed evidence. Defense counsel stated that the shooter in this case was initially described as a "black male juvenile," while appellant was 30 years old at the time of the offense. She also stated that the July 2002 incident involved a group of Black juveniles shooting at Eneliko and Tanner, who were with other juveniles. In the September 2002 incident, defense counsel stated that Eneliko was sitting in a car in front of his house when an unidentified Black man came up and shot him in the arm.
>
> Counsel also asserted that appellant was not liked because he was not from the neighborhood, which was cliquish. She further claimed that his car and house had been vandalized on several occasions and that people in the neighborhood wanted "him out of there."
>
> The trial court rejected defense counsel's request, explaining: "I don't believe that there is a sufficient nexus between-shown to the Court between those incidents to show third-party culpability which in some way evidences substantial or reasonable doubt of the defendant's guilt of the shooting in this case. So, I am going to exclude any reference to the shootings which occurred on July 2002 and September 2002 by either party."
>
> The following day, the court reconsidered its ruling, after defense counsel presented additional facts, including the fact that, after the September 2002 shooting-which occurred on Cameron Way-Eneliko described the shooter "as a black male, in his twenties, about 5'10?, 180-190 pounds, wearing all black clothing in a dark beanie cap." This description was similar to the description Eneliko gave of appellant's clothing in the present case. [Footnote 4: The defense's theory was that someone else was trying to kill Eneliko, who gave appellant's name as the shooter because he did not like him. Defense counsel stated that the reason Eneliko gave for appellant wanting to shoot him was that appellant "was upset about his car being

> broken into and he was on the street upset, and that the victims were supposedly laughing or snickering." According to defense counsel, this scenario did not make sense.]
>
> After hearing more argument from counsel, the court stated: "My ruling is going to remain the same. There should be no reference to these two subsequent shootings at or of Nafanua Eneliko. [¶] And my reasoning on this is based on the case law and authorities that these are events which do not suffice, in the Court's opinion, to raise a reasonable doubt about defendant's guilt for the crime for which he is charged in this case, and that they're speculative on both sides, for the People to say that it's Mr. Hogan who's causing these shootings; and on the defense's side to say that somebody else, some unknown, unidentified third party has a motive or opportunity to commit a crime on another date.
>
> "In addition, the Court's ruling is based upon [an Evidence Code section] 352 analysis. And the Court finds that the probative value of that testimony relating to the two other shootings is outweighed by the necessity of undue consumption of time. And further, it would create a substantial danger of confusing the issue, misleading the jury, and presenting numerous facts and other incidences before the jury. So, the court's ruling will stand on that."

(Resp't Ex. F at 7-9.)

The court of appeal held that because the evidence of existence of a third party was so weak, the trial court did not err under California law in refusing to admit it. (Id. at 5-6.) As to the federal constitutional claim, the court held: "'[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.'" ([People v.] Hall [(1986)] 41 Cal.3d [826] at p. 834.) In this case, where the evidence in question was extremely tenuous, there plainly was no constitutional violation." (Id. at 6.)

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotations and citations omitted). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. Id. "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Id. at 325-26; see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996).

Under California law, third party culpability evidence is inadmissible "if it simply affords a

14

possible ground of suspicion against [another] person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense." Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983) (quoting People v. Green, 27 Cal. 3d 1, 22 (1980)). In Perry, the Ninth Circuit weighed the defendant's "undeniably strong" interest in presenting third party evidence against the state's "compelling" interest in "reliable and efficient trials" and held that the California rule is facially constitutional. Perry, 713 F.2d at 1451, 1455.  Even if third-party culpability evidence "is not actually irrelevant," a trial court does not violate a defendant's Sixth and Fourteenth Amendment rights when it prohibits evidence that "is sufficiently collateral and lacking in probity on the issue of identity...." Id.

Here, the state court's decision was not unreasonable. It evaluated petitioner's claim using a California evidentiary standard that has been approved by the Ninth Circuit, and correctly pointed out that the evidence of the existence of a third party who was potentially culpable was so thin as to be nearly nonexistent. Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

The petition for a writ of habeas corpus is DENIED.

Furthermore, because reasonable jurists would not find this Court's denial of his claims debatable or wrong, see Slack v. McDaniel, 529 U.S. 473, 484 (2000), no certificate of appealability ("COA") is warranted. The denial of a COA is not appealable, but Petitioner may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases, foll. 28 U.S.C. § 2254.

The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: 6/20/12

SAUNDRA BROWN ARMSTRONG
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

LESTER HOGAN,

        Plaintiff,

  v.

PEOPLE OF THE STATE OF CALIFORNIA et al,

        Defendant.

Case Number: CV07-00779 SBA

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 24, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Lester Hogan V-52254
California State Prison - Calipatria
P.O. Box 5005
Calipatria, CA 92233

Dated: July 24, 2012

        Richard W. Wieking, Clerk
        By: Lisa Clark, Deputy Clerk

G:\PRO-SE\SBA\HC.07\Hogan0779.deny-gaw.wpd

16